NATIONAL BANK OF TULSA v. OKLAHOMA TAX COMMISSION.

No. 30625. Feb. 8, 1944.

*145 P. 2d 768.*

Jos. L. Hull and James E. Bush, both of Tulsa, for plaintiff in error.

F. M. Dudley, A. L. Herr, C. D. Stinchecum, and A. D. Howell, all of Oklahoma City, for defendant in error.

GIBSON, V. C. J. This is an appeal by the National Bank of Tulsa, pursuant to the State Tax Uniform Procedure Act of 1939, from an order of the Oklahoma Tax Commission assessing· additional income tax against it for the years 1937 and 1938.

The controversy involves the question of the proper treatment of bad debts owing to the taxpayer with reference to their deduction from gross income and their inclusion therein when subsequently collected, 68 O.S. 1941 § 880 (f).

The commission, acting pursuant to authority said to have been delegated to it by 68 O. S. 1941 § 905, promulgated certain rules and regulations for handling bad debts in the process· of determining taxable income. According to those rules, the taxpayer is authorized to adopt either of two methods to that end. He may employ the so-called direct method of deduction of such debts when they are ascertained to be worthless, or he may adopt what might be termed the indirect method of deduction through the medium of a reserve account maintained for the purpose of absorbing all losses resulting from the charge-off of worthless debts. This reserve account is to be maintained at a level consistent with anticipated losses as estimated with due regard to the character of the taxpayer's business, the trend of the times, and the average losses theretofore sustained as a result of bad debts.

When debts ascertained to be worthless are charged off, the reserve account suffers to that extent, and additions thereto may be made in each tax year in order to maintain it at the proper level as aforesaid. The amounts so charged off do not necessarily control the amount of additions that must be made to the reserve account. The amount of the additions to be allowed depends on the anticipated charge-offs estimated in the manner stated above. These necessary additions constitute the deductions to be allowed the taxpayer in lieu of direct deductions for each charge-off.

The taxpayer in this case adopted the reserve account, or indirect, method of claiming deductions for bad debts from its gross income.

According to the stipulation, the taxpayer bank was organized and commenced business on April 25, 1933. Under a contract of that date with the Exchange National Bank of Tulsa, it assumed the deposit liabilities of that institution and took two notes from the latter aggregating the sum of approximately 19 million dollars and representing the difference between the properties purchased from the Exchange Bank and the liabilities assumed.

In 1934 the taxpayer bank commenced charging off certain portions of the Exchange Bank's notes. In that year the sum of $400,000 was charged to the reserve account for bad debts. In 1935 the sum of $600,000 was charged off and charged to the reserve account, and in 1936 the sum of $100,000 was treated likewise.

For the purpose of calculating the amount of additions necessary to be made to the reserve account, the taxpayer in 1936 commenced to apply a certain method based on the percentage of losses for bad debts over a given period, which seems to be the method

recognized and applied under the federal income tax laws. This plan did not provide sufficient additions to the reserve to absorb the 1934 and 1935 charge-offs made necessary by the Exchange Bank's notes aforesaid. As a result there was added to the reserve fund the sum of approximately $10,000 to replenish the 1934 deficiency, and the sum of approximately $500,000 for 1935, in order to bring the reserve up to an amount sufficient to absorb the abnormal charge-offs.

A controversy between the taxpayer and the commission arose over the $500,000 reserve account set up in the 1935 return. The commission reduced it to the sum of approximately $200,000 and so disallowed additions claimed by the taxpayer in the amount of $300,000. The controversy was settled accordingly. At that time certain adjustments were made as to the 1933 and 1934 returns, and in the process thereof the $300,000 was treated as a provision for bad debt reserve in those two years. However, this allocation resulted in no benefit to the taxpayer in the form of deductions of any part of the $300,000 from its gross income at the time the 1935 return was settled. It received no tax benefits as a result of the additions allowed for 1933 and 1934.

In its 1937 return the taxpayer claimed deductions for additions to its reserve account the sum of $150,974.20, and in its 1938 return the sum of $157,027.70 for like deductions. The commission reduced these additions to $7,584.28 and to $36,997.15, respectively, thus depriving the taxpayer of deductions from its gross income accordingly. Thereupon the commission fixed the bad debt reserve as of December 31, 1937, at $85,839.68, and at $200,000 as of December 31, 1938. More specifically, at the beginning of 1937 the balance in the reserve account was $77,255.40. In 1937 and 1938 the taxpayer claimed $308,001.90 as additions to the account, which would make the total sum of $385,257.30. During those years bad debts in the sum of $41,887.38 were charged against the account, leaving a balance in the reserve at the close of 1938 of $343,369.92. This sum, says the taxpayer, was not excessive in view of its outstanding loans in the sum of $15,387,076.02. The commission says the sum of $200,000 was sufficient.

The controversy growing out of the above action of the commission involves principally the question of the proper disposition or allocation of the sum of $119,985.55 collected by the taxpayer in 1938 on the notes of the Exchange Bank which had theretofore been charged off. This sum represented the first recovery had on those notes.

The commission held to the view that the sum so collected constituted recovery of charged off debt and was therefore gross income for 1938 and should for that reason be allocated to the reserve for bad debts. In fixing the reserve for 1938 at $200,000 the commission included the above sum so collected on the charged-off notes.

On the other hand, the taxpayer insists that the sum collected should be treated as recovery of capital for the reason that the reserve account for 1933 and 1934 was set up out of its surplus and other income which was not taxable, and as a result of which it received no tax benefits, or escaped no income tax. It is asserted that said sum of $119,985.55 should have had no part in the assessment of income tax for 1938.

If the sum collected on the Exchange Bank's notes constituted a recovery of a bad debt within the meaning of the statute, it was properly considered as gross income for 1938, and, if gross income, it was properly added to the reserve for bad debts. If it was not a recovery of a bad debt within the meaning of the statute, but constituted recovered capital, it should not have been added to the reserve account or considered at all in determining the taxpayer's net income, and the taxpayer would be entitled to a deduction from its gross income in an amount equal to said sum as a necessary addition to the reserve account.

The main point of the taxpayer's argument is that the Exchange Bank's notes caused abnormal charge-offs, and that it used funds other than taxable income for its reserve account to take care of those charge-offs, and for that reason the subsequent recovery on the notes should be used to reimburse the accounts from which the funds were originally taken. In this connection it is urged that if the original reserve account against which the bad debts were charged had been created from taxable income which escaped taxation only because it became a reserve account, then the commission might have been justified in crediting the reserve with the amount recovered on the bad debts, but where, as here, the account was created from assets other than taxable income, the commission was unauthorized to treat the recovery as taxable income and to credit the reserve account therewith.

In further explanation of the reserve account plan for handling deductions of charged-off debts from gross income, we set out here the statement of a well-known income tax authority as quoted in the briefs. It reads as follows:

"If the taxpayer has always used the reserve method of charging off bad debts (or has used it since 1921) any recoveries on account of bad debts previously charged against the reserve do not represent income as such but are credits to the reserve, thus decreasing the amount of additions to the reserve for the current year necessary to bring the reserve up to a reasonable amount. It is this addition to the reserve which is deductible on the income tax return."

In support of its action in adding the bad debt recovery to the reserve account instead of allowing the taxpayer to augment the same by taxable income, the commission cites certain federal decisions, including those of the Board of Tax Appeals. Among the cases cited is Helvering, Com'r of Int. Rev., v. State Planters Bank & Trust Co., 130 Fed. 2d (C.C.A.) 44, which apparently embraces every point presented in the commission's argument. In that case it was held generally that bad debts subsequently collected after being charged off as worthless should be included as income in computing income tax, and that such collections must be so included regardless of whether the charge-off resulted in a tax benefit to the taxpayer, and that if the taxpayer elects to charge off a debt he must account for its subsequent collection as income and cannot treat it as recovered capital. And the rule which is said to be controlling here is there stated as follows:

"Where a debt has been charged off in one year and collected in a subsequent year, the fact that such charge-off did or did not result in tax benefit cannot be considered in connection with the taxability of its collection as 'income,' since the taxability is determined by the charge-off and not the tax benefit accruing therefrom, and each taxable year must be regarded as an independent unit for income tax purposes."

There the court considered certain Treasury regulations, similar to those of the commission, which provide that "any amount subsequently received on account of a bad debt or on account of a part of such debt previously charged off and allowed as a deduction for income tax purposes, must be included in gross income for the taxable year in which received." The court interpreted that provision as follows:

"There is nothing in the regulation or in any statute which makes the inclusion in gross income of collections on bad debts, previously charged off as worthless, dependent upon whether or not the charge-off has resulted in a tax benefit to the taxpayer. It is argued that the language of the regulation providing for the inclusion of the collection only where the debt has been 'charged off and allowed as a deduction for income tax purposes' has this effect; but manifestly a debt is charged off and allowed as a deduction for income tax purposes when it is claimed and allowed as a deduction in the return of the taxpayer, for the charge-off and allowance is made in connection with the return, not in connection with the payment of the tax."

It is not difficult to understand why the subsequent collection of a charged-off debt formerly used by the taxpayer to reduce his gross income should be treated as gross income for the year in which the collection was made, where such charge-off actually operated to relieve the taxpayer from the payment of any income tax. Nor is it entirely material here whether we agree with the decision in the last-cited case to the effect that a subsequent collection is to be treated as gross income regardless of whether the prior charge-off saved the taxpayer from payment of any income taxes.

In that case the court apparently had under consideration the direct method of charge-off and not the reserve account method. However, this is not entirely made clear. We see a material distinction between the two plans so far as taking deduction for charge-offs is concerned. In the former, the taxpayer adopts the simple device of charging off any debt ascertained to be worthless and sets it up in his income tax return as a deduction from the gross income therein shown, and the commission can only determine the truthfulness of the deduction, and the taxpayer is entitled to the benefit thereof as a matter of course. Where the reserve account system is used the bad debts may be charged off in the same way as in the direct method, but the commission may say whether the taxpayer shall credit the reserve with all or any part of the charge-off and so allow him to take a corresponding deduction from his gross income. The commission might decide the reserve is large enough in the circumstances, and not permit the taxpayer to deduct the charge-off from his gross income. All this clearly reveals why the rule of the commission, as adopted from the federal taxing authorities authorizing the reserve account plan, originally contemplated a reserve made up wholly of taxable income in the first instance, income that has escaped taxation for the sole reason that it was set up as a reserve for bad debts.

If the reserve against which a bad debt is charged is not made up of taxable income, income that escaped taxation only because it was credited to the reserve, the subsequent collection of the debt cannot be considered as gross income for the year in which it was collected; the collection could be nothing other than a recovery of such capital as the charged-off obligation represented.

Such was the case here.

We note that under the Federal Act (26 U.S.C.A. 23), as well as our own (68 O. S. 1941 § 880), debts ascertained to be worthless and charged off within the taxable year may be claimed as a deduction from gross income "in computing the net income" (sec. 880, supra). Under our statute the computation of the "net" income is the ultimate object. If there is no net income notwithstanding the charged-off debt, how can it be said that the deduction of the debt was used in computing the net income when the charge-off in no way affected the net income? To us it would seem to play no part "in computing the net income" when there was no such income to compute. And if it played no part, and constituted a charged-off loss for which the taxpayer received no reduction in his income taxes, how can it be said that the subsequent collection of the debt would be gross income and not a recovery of a former loss of capital?

In the State Planters Bank Case, supra, the Circuit Court of Appeals said that the recovery under circumstances as above related constituted gross income. The commission places great reliance on that decision, but subsequent to the date thereof, August 18, 1942, Congress has acted to clarify the numerous interpretations placed on the Revenue Act by the courts and federal agencies with reference to the treatment and disposition of recoveries of previously charged-off bad debts. By the Revenue Act of 1942 (October 21, 1942), Congress, in effect, repudiated the holding of said case, and by section 116 of the act provided specifically that recoveries such as are under considera-

tion here should be excluded from gross revenue. The act excludes from gross income "income attributable to the recovery during the taxable year of a bad debt, . . . to the extent of the amount of the recovery exclusion with respect to such debt," where the deduction for such bad debt had not caused a reduction in the taxpayer's tax.

The foregoing provision was made to apply to all previous revenue acts.

By reason of the foregoing facts and circumstances we feel in no way bound by the decision in the State Planters Bank Case. That case has apparently added to the confusion already existing in the interpretation and application of the Federal Income Tax Law as reflected by inconsistent departmental rulings and conflicting decisions of the federal district courts. In the interest of harmonious application of the state and federal income tax laws, which in their respective provisions are so nearly alike, we consider it our duty to disregard that case and interpret our own act with reference to this particular question in a manner consistent with the intention expressed by the Congress in the 1942 act.

It is obvious, so far as our statute is concerned, that the recovery of the bad debt in this case was nothing other than recovery of capital for the reason that the deduction of the debt, or the charge-off thereof, had in no way affected the computation of a net income for the year in which it was charged off and in no way affected the income tax liability.

We do not believe that the Legislature intended that the estates of taxpayers suffer the disintegration and ultimate destruction that would inevitably follow the application of the plan adopted by the commission in this case.

The commission, as aforesaid, fixed the reserve of the taxpayer at $200,000 for 1938. When considered in the light of the experience of other banks in the state, the sum was inadequate. The larger amount claimed by the taxpayer,

$343,369.92, appears reasonable and should have been allowed.

When the reserve for 1938 shall be so fixed by the commission, the sum of $119,985.55, representing the recovery of bad debts previously charged off, must be treated, not as gross income, but as capital return, and not included in such reserve account.

The order of the commission is reversed and the cause remanded, with directions to proceed according to the views herein expressed.

CORN, C.J., and RILEY, OSBORN, WELCH, HURST, DAVISON, and ARNOLD, JJ., concur.